21UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHERRI SICKELS,                                 )
                                                )
                    Plaintiff,                  )
                                                )
        v.                                      )        Case No. 4:21-CV-00963-JAR
                                                )
DENIS MCDONOUGH, Secretary of the               )
Department of Veterans Affairs,                 )
                                                )
                    Defendant.                  )

## MEMORANDUM AND ORDER

This matter is before the court on Defendant Denis McDonough's Motion for Summary

Judgment.  ECF No. 39.  For the reasons set forth below, the Motion will be granted in part and

denied in part.

## BACKGROUND

Plaintiff Sherri Sickels is a transgender woman and former marine who has been

employed by the Department of Veterans Affairs since 2008.  She brings this action against

Defendant for sex discrimination and reprisal under Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e-2 and e-3, based on her non-selection for certain vacancies, her participation in

a Fact-Finding interview, and repeated bullying and harassment.  ECF No. 20.

On September 29, 2023, Defendant filed the present motion for summary judgment.  ECF

No. 39.  In support of its motion, Defendant filed a Statement of Uncontroverted Material Facts

and numerous exhibits.  Sickels filed an opposition memorandum and a Response to Defendant's

Statement of Material Facts.  ECF Nos. 48 and 49.  This "Response" did not, however, respond

to and controvert Defendant's individual statements of fact.  Instead, it sets out Sickels's own

statements of fact.  Because Local Rule 4.01(E) provides that "[a]ll matters set forth in the

moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party," and Sickels failed to controvert any of Defendant's statements, Defendant's statements of fact are deemed admitted.  Where Sickels' Response establishes a genuine dispute as to a material issue of fact or that a justifiable inference may be drawn in her favor, the Court accepts Sickels's version of events as true.

The undisputed facts on this record are as follows.

A.

Sickels began working for the VA in 2009 as a WG-1 Housekeeping Aide.  In 2013, she was hired as a WG-5 Electrical Helper in the Engineering Department at the VA St. Louis Health Care System in St. Louis ("St. Louis Facility").  By that time, Sickels identified as a woman and went by Sherri instead of her name assigned at birth, Shane.

John Moehlman, a supervisor at the St. Louis Facility from 2011 to 2018, recalled at deposition that Ryan Duffy, Shane Pettis, John Wehlermann, and Wes Sargent had an issue with Sherri coming to the electrical shop.  Duffy, Sickels's supervisor and former high school classmate, appeared friendly with Sickels, but "flat out would tell you he didn't respect her." ECF No. 48-2 at 33:22-24.  He believed Sickels "was working some sort of an angle" with her transition and did not believe she was going to be a competent electrician.  *Id.* at 34:3-13.

When Duffy informed Pettis, a WG-10 Electrician at the time, that a transgender employee was joining the shop, Pettis stated that he was going to refuse to work with her.   He moved his equipment into the battery room because he did not want to work around her.  He did not want to eat lunch in the same room as her and sometimes moved elsewhere to eat.  He referred to Sickels as "it," "thing," "freak," and "disgusting."  ECF No. 48-3 at 92:21-25.  When

Pettis was promoted to a supervisor position in 2018, he told Moehlman that he did not want her to "to even be close to being an electrician or even in the shops."  ECF No. 48-3 at 17:2-12.  Wehlermann, the Associate Chief of Maintenance and Operations at the St. Louis Facility, also referred to Sickels as "it" and "thing".  ECF No. 48-3 at 20:2-25; 33:18-34:3.  And at foreman meetings, Duffy and Wehlermann "pretty much beat up on her over" her transgender status, and "slam[ed] her on what kind of a woman she would be and that kind of stuff."  ECF No. 48-2 at 34:25-35:7; 35:19-20.

Sargent, the Chief Engineer at the St. Louis Facility, was "very religious" and, because of his beliefs, did not want anything to do with Sickels.  ECF No. 55 at 12.  Moehlman testified he heard Sargent "be adamant that . . . she would be condemned by god," and that transgender and gay people "should not be because that's not the way it was written in the Bible."  ECF No. 48-3 at 95:13-18.  Moehlman also overheard Sargent comment that he wanted Sickels gone and that he didn't want her in his department.  *Id.* at 41:4-5.

Some of these comments filtered back to Sickels, and she was the subject of negative comments from her other colleagues as well.  She reported some of these comments to Sargent and Penny Mathon, the Administrative Officer, but she "only mentioned one time that [her] status as transgender was brought up, the majority 99% of her complaint was bullying in the form of harassment and slander."  ECF No. 41-35 at 1.  Sargent asked Cindy Bukowsky to conduct a Fact Finding based on Sickels's reports, "though nothing ever came of it." ECF No. 41-2 at 47:1-47:16.  At deposition, Sickels testified that the harassment she experienced did not change after she sent Sargent her Report.

Sickels experienced other bullying as well. Sickels testified that on one occasion:

There was a video shared to me at one time of people in the pipe shop passing around a photo of a large man in a Hooters outfit dancing on a pole and, like, real

3

– a hairy beard and body and everything.  And they were saying that that was me, and they were all passing it around the table laughing.

*Id.* at 34:21-35:1.  And on another occasion, her coworkers "were watching the news in the break room, and there was a news bit on about a transgender student fighting for restroom rights at a local school.  And they were proceeding to make fun of transgender people and how they should have no rights for a restroom."  *Id.* at 44:5-10.

Sickels's bathroom and other property were also repeatedly vandalized or tampered with.  At some point, someone "broke into the restroom," which was pin coded, "sliced open numerous bottles of . . . lotion soap . . . [a]nd they covered the floor in it."  *Id.* at 34:3-9.  Because the room "didn't have very good lighting," she "walked in and slid across the floor.  [She] hit [her] elbow on the sink, bruising and cutting [her] arm.  [She] hit [her] head on the tile floor, and literally slid across the room into the bathroom stall."  *Id.* at 34:9-13.  On another occasion, "somebody broke into [her] restroom—and it is disgusting as it sounds—took wads of paper towels like they were [w]rapping around their hand and covered them in feces and stuck them all over the floor in cones."  *Id.* at 34:14-18.  On yet another occasion, "[s]omeone removed the brakes on [her] bicycle at work . . .  which caused [her] to slam into the wall at the bottom of Chapel Hill."  *Id.* at 35:19-21.

Sickels also testified that she was forced to wear a men's uniform at work despite her request for a woman's uniform.  ECF No. 41-2 at 55:14-20.  But, "for whatever reason," she "just was turned down[.]"  *Id.* at 58:4-5.  She nonetheless credited Duffy for buying her "women's cut denim jeans at first when [they] were allowed to wear denim."  *Id.* at 57:5-9.

## B.

In 2015, Sickels was promoted to a WG-08 Electrical Helper position, but she had repeatedly applied to WG-10 Electrician positions throughout her employment with the VA—

4

fourteen times since 2009.  Though the parties set forth few undisputed material facts regarding

the application process at the St. Louis Facility, a Human Resource specialist explained that a

panel of subject matter experts ("SME panel") chosen by a Selecting Official initially reviews

applicants' materials and filters out those without the minimal qualifications for the relevant

position.  The SME panel then selects the best-qualified applicants to be interviewed by the

manager or an interview panel.  In the interview, panelists ask each candidate performance-based

questions relevant to the position and score their answers on a scoring matrix or scoring grid.

The interview panel may then recommend a particular candidate to the Selecting Official.  The

recommended candidate does not need to be the highest scoring candidate, and the Selecting

Official is not required to select the highest scoring candidate or any candidate at all.  Even

though "they typically go with the highest-scoring candidate," if the Selecting Official does not

select the highest scoring candidate, "it needs to be justified with . . . an email to HR, some

notes, and the selection materials that they provide with their selection."  ECF No. 41-8 at

108:16-24.

In April 2018, Sickels applied for an electrician position and "beat out the other candidate

by over 40 points on the interview."  ECF No. 55 at 15.  Sickels testified that she later learned

from Duffy that Wehlermann was enraged by Sickels's interview performance, allegedly stating,

"How the hell did this happen again?  We're not doing this now.  I'm voiding the interview."

ECF No. 41-2 at 36:9-15.  Nobody was selected to fill the position at the time, and the vacancy

was later reposted.

Duffy testified that after the interview Sargent told him to put "something in writing as to

why [Sickels] is not qualified for this position."  ECF No. 41-4 at 83:17-18.  Duffy explained

that he had interviewed Sickels several times but never recommended her, and Sargent "just

5

wanted to know why." *Id.* at 85:2-3.   Accordingly, on July 16, 2018, Duffy sent Sargent a reference in which he determined that Sickels "does not yet possess the skills and knowledge for the position."  ECF No. 41-6.  He explained that, "[w]hile she does perform a lot of day to day maintenance," he did not feel that Sickels was journeyman proficient in medium voltage or "phase 480V and 208V systems," which "can lead to injuries or death along with destruction of VA equipment." *Id.*  He also explained that he had counseled Sickels when she first started in the electric shop that "in order to advance beyond to a WG-10 Electrician she would need to attend college classes on her own to get a theoretical knowledge base while also working with the WG-10 electricians here to gain the practical knowledge." *Id.*  He concluded by stating that he would advise Sickels to get the proper education and reapply later. *Id.*

On August 9, 2018, Sickels interviewed for five WG-10 Electrician vacancies—the same position she applied for in April.  The interview panel consisted of Wehlermann, Moehlman, Pettis, and Duffy.  Moehlman recalled at deposition that there was general discussion among the panelists after the interview about how "there was no way she was going to become an electrician and nobody wanted her in their shop."  ECF No. 48-3 at 54:25-55:22.  Moehlman also witnessed Pettis physically erase and change his evaluation of Sickels's performance after the interview.  When he asked Pettis why he was changing Sickels's score, Pettis responded, "I don't want that thing in my shop."  ECF No. 48-3 at 85:10-85:15.  Wehlermann was present when Pettis changed Sickels's score, and, according to Moehlman, he "knew about the whole thing.  He sat there.  He was—he was in the room with us." *Id.* at 86:13-17.

Moehlman did not witness Pettis change or lower any other candidate's score on the interview.  The final score that Pettis gave her was five to six points lower than the score she was given by other panelists, and there were no similar discrepancies among the panelists'

6

evaluations of any other candidate.  Nevertheless, Sickels scored 78 out of 144 on the interview—the second highest score—but the interview panel recommended the top scoring candidate in the interview and four candidates with lower scores for the vacancies.  Moehlman disagreed with the recommendation, and he believed Sickels was qualified for the position.

Sargent was the Selecting Official for the position.  He could not recall "ever having a vacancy selection where [he] had multiple names, and there were individuals that were selected or recommend—I should say 'recommended' lower than other scores [sic]."  ECF No. 41-12 at 52:25-53:4.  He stated that he conducted his own review of the applicants' resumes, references, and interview panel comments to try to understand the interview panel's recommendation.  These materials included references from Duffy, Clarkson, and Dan Eibeck. Sargent used those application materials to create a decision matrix in which he classified the candidates' Resumes, "Interview Panel Comments," "Reference Comments Pro," and "Reference Comments Con," as red, yellow, or green.  *See* ECF No. 41-13.

Sickels received a red classification on "Interview Panel Comments" and "Reference Comments Con."  The explanations for those classifications were:

> No High Voltage, No Classes Completed / Answered math problem, could not justify answer[.]
>      . . .
> Not skilled in medium voltage, definitely not in high voltage.  Is not qualified, lacks training and understanding of basics.  Knows what to do, but not why.  Doesn't listen attentively.  Does not have 3 years of electrician experience, no electrical schooling, lacks high voltage training, has never taken an electrical code class.  Would not hire as an electrician, has not demonstrated electrician education.  Has not observed work with high voltage.

*Id.* Sickels was also the only candidate who did not receive a green classification on "Reference Comments Pro" and "Resume Review." Sargent eventually determined that Sickels was not among the most qualified candidates.[1]

On August 19, 2018, Sickels was notified that she was not selected to fill any of the vacancies. Thereafter, she reported to the VA's Office of Resolution Management ("ORM") a claim of non-selection based on her transgender status, and on November 23, 2018, Sickels filed a formal EEO complaint. On December 21, 2018, the ORM notified Sickels that it accepted her complaint of sex discrimination based on her non-selection for the position. ECF No. 41-14.

On December 4, 2018, Sickels interviewed for another WG-10 Electrician vacancy, and Duffy, Pettis, and Wehlermann again served on the interview panel. This time, Sickels received the third highest interview score, and the interview panel did not recommend her for the vacancy. The candidate recommended by the interview panel received a score of 106 out of 180, answered the panel's questions well, and was a journeyman. Sargent was again the Selecting Official for the position, and he again accepted the interview panel's recommendation. On January 3, 2019, Sickels received notice that she was not selected for the position.

On February 22, 2019, Sickels was informed that she was not referred for consideration for a WS-09 Maintenance Mechanic Supervisor position. Wehlermann, who served on the Subject Matter Expert panel for the position, reviewed Sickels's resume and concluded that it did not evince the required ability to assemble, install, or repair equipment. He scored her resume 7 out of what appears to be a total of 20 points. *See* ECF No. 41-19. Thirteen candidates scored higher than Sickels. Wehlermann accordingly determined that Sickels was not qualified for the position, and she was not selected for an interview.

---

[1]     Sargent's decision matrix indicates that the top scoring candidate in the interview withdrew his application on August 15. ECF No. 41-13.

On May 30, 2019, Sickels received notice that she was not selected for a WS-10 Maintenance Mechanic position.  Darren Reeves served as the Subject Matter Expert for the position.  The parties have not set forth any additional uncontroverted material facts about this vacancy selection.

On June 6, 2019, Sargent emailed Sickels requesting her participation in a fact-finding inquiry and proposing three dates and times for an interview.  The email clarified, "You are NOT the subject of the fact finding."  ECF No. 41-23.  It also informed Sickels that she was within her rights to have a representative of the American Federation of Government Employees ("AFGE") present at the interview.

Sickels participated in the investigation on June 13, 2019.  Though she repeatedly requested an AFGE representative to be present during the interview, all the representatives were out of town for training, so she "did not have anybody."  ECF No. 41-2 at 117:17-18.  At the beginning of the interview, Sickels signed a Notice of Witness Obligations, Protections, and Privacy Act Matters document, and Sargent informed her that there would be no disciplinary action taken against her if she provided the requested information. ECF No. 41-24.  During the interview, Sargent explained that he was conducting a fact finding concerning the violation of certain Confidentiality Statements, and he asked questions about a request for assistance concerning unfair hiring practices that Sickels had sent to Senator Dick Durbin's office.  ECF No. 41-24.  In the request, Sickels stated that information was sent to her through anonymous emails from someone on a SME panel, and Sargent asked who provided that information to her.

On June 18, 2019, Sickels contacted the ORM, requesting to amend her November 23, 2018, Complaint to append the following:

> Whether complainant was subjected to a hostile work environment based on Sex (LGBT) and Reprisal, as evidenced by the following events:

1. On January 3, 2019, she was not selected for the position of Electrician, vacancy number 10334831.

2. On February 22, 2019, she was not referred for the position of Maintenance Mechanic Supervisor, vacancy number 10410205.

3. On May 30, 2019, she was not referred for the position of Maintenance Mechanic Supervisor, vacancy number 10491177.

4. On June 13, 2019, she was subjected to a fact finding investigation.

ECF No. 41-17 at 1-2. The next day, the ORM notified Sickels that her non-selections on January 3, 2019, and February 22, 2019, were "discrete acts that were not raised within 45 days of occurrence and are therefore dismissed as independent actionable claims . . . for failing to comply with the regulatory time limits." *Id.* at 2. However, the ORM explained that the January 2019, February 2019, and May 2019 non-selections were "sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim." *Id.* It also determined that "[t]he matters comprised in [Sickels's] hostile work environment claim establish a pattern of conduct that could create a hostile work environment and/or that could interfere with the job performance of a reasonable person." *Id.* The ORM accordingly amended Sickels's claims as follows:

Claim 1: Whether complainant was discriminated against based on sex (LGBT), when on August 29, 2018, she was notified of her non-selection for the following position: WG-10, Electrician, vacancy announcement CBAM-1025220-18-HRG.

Claim 2: Whether complainant was subjected to a hostile work environment based on Sex (LGBT) and Reprisal, when: a) On January 3, 2019, she was not selected for the position of Electrician, vacancy number 10334831; b) on February 22, 2019, she was not referred for the position of Maintenance Mechanic Supervisor, vacancy number 10410205; c) on June 13, 2019, she was subjected to a fact finding investigation; and includes the following independently actionable claim:

1. On May 30, 2019, she was not referred for the position of Maintenance Mechanic Supervisor, vacancy number 10491177.

*Id.* at 3.

On May 13, 2020, Sickels applied for another three WG-10 Electrician vacancies. The Subject Matter Expert panel, which included Wehlermann and Duffy, determined that her resume, along with twelve others, met the qualifications for the position. But because Wehlermann only "had one day to give for [an] interview panel," he and Duffy declined to interview six applicants who they determined were not as qualified for the position. ECF No. 41-11 at 66:9-67:18. Sickels was one of those six candidates. The resumes of the seven applicants who were interviewed "reflected a deep education in electrical theory, with certificates as journeyman or an education in the electrical field and work experience equal to a journeyman electrician." ECF No. 41-21 at 3. On June 25, 2020, Sickels was notified that she was not selected for the position.

Five days later, Sickels contacted the ORM and reported sex discrimination related to her non-selection for the position, and on July 14, 2020, Sickels filed a formal EEO complaint alleging sex discrimination and reprisal when she was not selected for an interview on June 25, 2020.

## C.

On August 2, 2021, Sickels filed a complaint in this Court. Since then, she has amended her complaint twice. The operative complaint in this case alleges sex discrimination and reprisal under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 and 2000e-3. ECF No. 20. In Count I, she alleges that Defendant's employees sexually harassed her by making discriminatory comments about her transgender status, failing to update her email address to include "Sherri" instead of her name assigned at birth, and forcing her to wear a men's uniform despite her request for a women's uniform. She also alleges that her non-selections for the August 2018, January 2019, February 2019, May 2019, and June 2020 positions were a "direct

and proximate result of her status as a transgender person." *Id.* at 4. In Count Two, she alleges that the June 2019 fact-finding interview, as well as the harassment and non-selections outlined above, was retaliation for her filing charges of discrimination.

Defendant moves for summary judgment. ECF No. 39. First, it argues that Sickels did not exhaust her administrative remedies for some of her claims because she failed to present her allegations of bullying to the ORM. It further argues that Sickels failed to plead a hostile work environment claim because the phrase "hostile work environment" does not appear in her complaint. Finally, it argues that it had legitimate, non-discriminatory reasons for declining to select for the relevant vacancies and for interviewing her as part of the June 2019 Fact Finding.

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the Court considers the evidence and reasonable inferences in the light most favorable to the non-moving party. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). To avoid summary judgment, the non-movant must demonstrate the existence of specific facts supported by sufficient probative evidence that would permit a finding in his favor on more than speculation. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017). Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

**A. Timeliness and Exhaustion**

Title VII "establishes an administrative procedure which a complaining employee must follow before filing a lawsuit in federal courts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994). For federal employees, this requires that a complainant initiate contact with an Equal Employment Opportunity counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). "If the matter cannot be resolved informally with the help of the counselor," then the federal employee may "file a formal EEO complaint with the agency." *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) (citing 29 C.F.R. § 1614.105(a)(1)). A plaintiff must meet this requirement for each employment practice alleged to be discriminatory or retaliatory. *See Voss v. Hous. Auth. Of the City of Magnolia,* 917 F.3d 618, 623 (8th Cir. 2019).

Defendant argues that Sickels failed to exhaust her administrative remedies by not contacting her EEO counselor within 45 days of her non-selection for the January 2019 Electrician position and the February 2019 Maintenance Mechanic Supervisor position. It explains that Sickels received notice that she was not selected for these positions on January 3, 2019, and February 22, 2019, respectively, but she did not contact ORM about these non-selections until June 18, 2019. The ORM accordingly rejected Sickels's non-selections for these positions in its June 19, 2019, notice. ECF No. 41-17 at 2.

In her opposition memorandum, Sickels "clarifies" that she does not assert claims in Count I and Count II for sex discrimination and retaliation based on her non-selection for

January 2019, February 2019, or May 2019[2] positions, and she does not address her non-selection for those vacancies in her response.  ECF No. 49 at 2.  She explains that she "only asserts these non-selections support a claim for hostile work environment based on her sex (transgender)."  *Id.* at 15  The Court will accordingly decline to consider Sickels's non-selection or non-referral for the January 2019, February 2019, and May 2019 vacancies as independently actionable claims.

**B.  "Hostile Work Environment" Claim**

Defendant next argues that Sickels has not alleged a hostile work environment claim. Even though Sickels claimed in her interrogatory answers that she is asserting a hostile work environment claim based on all the conduct that forms the basis of her discrimination and retaliation claims, Defendant notes that the term "hostile work environment" does not appear in the complaint at all.  Defendant therefore reasons that Sickels may not belatedly assert a hostile work environment claim.  ECF No. 43 at 14 (citing *Skaggs v. Walsh,* Case No. 4:20-cv-00591-SEP, 2021 WL 5140266, *1 at n.2 (E.D. Mo. Nov. 3, 2021)).  Even if she could, Defendant argues that such a claim would fail because Sickels's bullying allegations were not presented to her EEO counselor and may not be considered as part of her claim.  Because the only conduct she presented to the EEO concerned her non-selections for certain vacancies, her hostile work environment claim is limited to those non-selections and similar actions.  Such discrete conduct, Defendant argues, cannot form the basis of a hostile work environment claim.

The Court need not determine whether Sickels's complaint alleges a hostile work environment claim because it agrees with Defendant that such a claim would not survive summary judgment.  The Court must clarify, however, that "hostile work environment" is not an

---

[2]    It is unclear to the Court why Sickels abandons her sex discrimination claim with respect to her non-selection for the May 2019 position.  That claim of sex discrimination and reprisal appears to be timely.

14

independent cause of action under Title VII.  Though courts frequently use the term "hostile work environment claim," evidence of a hostile work environment is merely one way a plaintiff may demonstrate retaliation or discrimination on the basis of a prohibited criteria like sex.  *See* 42 U.S.C. §§ 2000e-2 and 2000e-3; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986); ("The phrase 'terms, conditions, or privileges of employment of [42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatory hostile or abusive environment."); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) .  The Court also notes that in Sickels's opposition memorandum she appears to disclaim any hostile work environment claim based on retaliation: she "clarifies that she . . . only asserts that [her] non-selections support a claim for hostile work environment *based on her sex (transgender)*."  ECF No. 49 at 15 (emphasis added).  And Sickels does not argue anywhere in her memorandum that the hostile work environment was retaliatory.  The Court will accordingly confine its analysis to whether Sickels has demonstrated sex discrimination based on a hostile work environment.

To demonstrate sex discrimination based on a hostile work environment, Sickels must show:

> (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action.

*Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 799 (8th Cir. 2021).  "The fourth element involves both objective and subjective components."  *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009).  The harassment must be "severe or pervasive

15

enough to create an objectively hostile or abusive work environment," and Sickels must believe that "her working conditions have been altered." *Id.* (quoting *Harris v. Forklift Syst., Inc.*, 510 U.S. 17, 21-22 (1993)).

Sickels argues that the discriminatory comments she suffered, the vandalism of her bathroom, the removal of the brakes on her bike, the video of her coworkers comparing her to a man in a Hooters outfit dancing on a pole, and her non-selections for the various vacancies are sufficient to meet this standard.[3]  But only her non-selections for the various vacancies may be considered as part of her hostile work environment claim.  She did not present these other allegations to the OPM, and she has provided no evidence that they fell within the statutory limitations period.

In *National Railroad Passenger Corp. v. Morgan*, the Supreme Court explained that a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  536 U.S. 101, 112 (2002).  And in *Clay v. Credit Bureau Enters., Inc.*, the Eighth Circuit clarified that acts "may be part of the same unlawful employment practice if they 'involve[] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same mangers.' . . . If, however, the prelimitations period acts have no relations to the acts within the limitations period . . . 'then the employee cannot recover for the previous acts.' "  754 F.3d 535, 539 (8th Cir. 2014) (quoting *Morgan*, 536 U.S. at 118-20).

The only timely acts identified in Sickels's charge of discrimination with the OPM are her non-selection for the May 2019 position and her being subject to a Fact Finding interview in June 2019.  The discriminatory comments she suffered, the vandalism of her bathroom, the

---

[3]     Sickels's charge of discrimination also alleged that her participation in the Fact Finding interview in July 2019 supported her hostile work environment claim, but Sickels does not address that interview at all in her opposition memorandum.

removal of the brakes on her bike, and the video of her coworkers involve mostly unidentified coworkers, at unspecified times, and do not involve promotional decisions. These allegations are therefore insufficiently related to the allegations presented to the OPM in her charge of discrimination to be considered part of the same unlawful employment practice. And, as Defendant rightly notes, "[t]he sweep of any subsequent judicial complaint may be only as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination." [4] *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Accordingly, only Sickels's non-selections for the August 2018, January 2019, February 2019, and May 2019 vacancies and the Fact Finding interview may be considered as part of her claim.

This conduct is difficult to square with a sex discrimination claim based on a hostile work environment. As the Supreme Court explained in *Morgan*,

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Morgan*, 536 U.S. at 115. Here, each of the actions supporting Sickels' hostile work environment claim are discrete acts which would be actionable on their own; in *Morgan*, the Supreme Court specifically identified "failure to promote" as a "separate actionable 'unlawful employment practice.'" *Id.* at 114. While the Court does not read *Morgan* to explicitly bar hostile work environment claims based on independently actionable conduct, Sickels does not identify any case in which a court accepted a hostile work environment claim based solely on promotional decisions like the ones at issue here. Even if these acts could support a hostile work

---

[4]  Sickels did not respond to this argument in her opposition memorandum.

environment claim, Sickels fails to demonstrate or explain how these promotional decisions constitute "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 549-50 (8th Cir. 2007)).  The Court will accordingly grant Defendant's motion for summary judgment on Sickels's hostile work environment claim based on sex discrimination.

### C.  Count I - Sex Discrimination

Excising Sickels's untimely and unexhausted allegations, Count I alleges that Sickels's non-selections for the August 2018 and June 2020 WG-10 Electrician violated 42 U.S.C. § 2000e-2(a).[5]  That provision makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  To succeed on her claim, Sickels must provide "either direct evidence of discrimination or evidence . . . sufficient to create an inference of discrimination under the *McDonnell Douglas* burden shifting framework."  *Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014).

Direct evidence of discrimination is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620 (8th Cir. 2017).  Under the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the

---

[5]    Again, Sickels timely presented her allegation that she was subjected to the June 2019 Fact Finding because of her sex, but she does not address the Fact Finding anywhere in her memorandum.

summary judgment record, viewed in the light most favorable to Sickels, must demonstrate a prima facie case of sex discrimination, that is: "(1) [s]he was a member of a protected group, (2) [s]he was qualified for the position for which the employer was accepting applications; (3) [s]he was denied the position; and (4) the employer hired someone from outside the protected class." *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006). The burden then shifts to Defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014). If Defendant does so, Sickels must then "prove the proffered justification is merely a pretext for discrimination." *Id.* The Court is mindful that its "inquiry is limited to whether the employer gave an honest explanation of its behavior" and it does "not sit as a super-personnel department that reexamines an entity's business decisions[.]" *Banford v. Bd. of Regents of Univ. of Minn.*, 43 F.4th 896, 900 (8th Cir. 2022) (quoting *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021)).

     1. August 2018 Electrician Position

     The parties agree for the purposes of this motion that Sickels can demonstrate the first three elements of sex discrimination under *McDonnell Douglas* with respect to her non-selection for the August 2018 Electrician position. However, Defendant argues that Sickels cannot provide any facts that give rise to an inference that her sex was the reason for her non-selection. Even if she could, Defendant reasons that there are legitimate, non-discriminatory reasons for her non-selection, and Sickels cannot demonstrate that these reasons are pretextual. It underscores that Wehlermann, Pettis, and Sargent, the three individuals who Sickels alleges discriminated against her in the hiring process for the August 2018 Electrician position, all testified that their non-recommendation and non-selection of Sickels was not based on her status as a transgender

person.  It further argues that Pettis and Wehlermann's references to Sickels as "it" and "thing" are sex-neutral and were unrelated to the decision-making process.

Sickels responds that the *McDonnell Douglas* analysis is unnecessary because the evidence described above is direct evidence of sex discrimination.  She underscores Pettis's statement to Moehlman that he changed her interview score because he did not want "that thing in [his] shop."  And she notes that one of the candidates that Sargent eventually selected for one of the five vacancies, Nick Bilicki, scored a 46 on his interview—32 points lower than Sickels did—and that he did not have high voltage experience either.  She accordingly reasons that "[t]his is direct evidence of discrimination and disparate treatment by Sargent when considering his statements and conduct in the workplace relating to his religious beliefs and feelings on Plaintiff's transgender status, as observed by others."  ECF No. 49 at 13.

As an initial matter, Sickels appears to conflate two different theories of discrimination. On the one hand, she argues that Sargent's previous comments and disparate treatment of Sickels is direct evidence of discrimination.  On the other hand, she attempts to impute the discriminatory actions of Pettis and the other panelists onto Sargent, even though these interviewers did not have the authority to make the final selection decision.  Courts often call this latter argument a "cat's paw" theory of liability, that is, "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)).  Sickels fails to distinguish between these two theories in her opposition memorandum, impermissibly aggregating Sargent's alleged

discriminatory animus with the interview panelists' animus.  The Court must, however, analyze each of these theories separately.

As to Sickels's theory that Sargent discriminated against her, the Court is dubious that some of the evidence Sickels cites demonstrates disparate treatment.  Sargent's use of a decisionmaking matrix does not demonstrate disparate treatment because it was VA policy at the time that a Selecting Official choosing a candidate who did not have the highest interview score must justify their decision in writing, and this was the first time that an interview panel had not recommended the highest scoring candidate to Sargent.  And the sole support for Sickels's claim that Bilicki lacked high voltage experience is deposition testimony from Moehlman.  ECF No. 49 at 13 (citing ECF No. 48-3 at 74:12-73:22).  But it is irrelevant whether Moehlman believed Bilicki had high voltage experience because Sargent relied on references from Bilicki's former and current supervisors stating that they observed Bilicki perform well in high voltage.

Sargent's comments about Sickels, however, support an inference of discrimination. According to Moehlman, Sargent stated that he did not want Sickels in the shop and that she would be condemned by God because she is transgender.  ECF No. 48-3 at 95:13-17; 41:1-10. Defendant argues that these statements were made at unspecified times and cannot provide direct evidence of discrimination because  " 'statements by decisionmakers unrelated to the decisional process' are not direct evidence."  *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) (quoting *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 933 (8th Cir. 2006)).  But it is not clear to the Court that Sargent's statements are "unrelated to the decisional process." They specifically concern Sickels's employment in the shop.

In *Browning v. President Riverboat Casino-Missouri, Inc.*, the Eighth Circuit concluded that an employer's reference to the plaintiff as "that white boy" in the context of his employment,

21

"warrants an inference of discriminatory attitude sufficient to permit the factfinder to conclude that race was a motivating factor in the decision to terminate [plaintiff]. Such use of a racial slur by a supervisor and the principal decisionmaker in [plaintiff's] termination constitutes more than a stray remark in the workplace and directly suggests the existence of bias; no inference is necessary." 139 F.3d 631, 635 (8th Cir. 1998). It further explained that the "comment did not simply evidence an awareness of the employee's gender or race, it reveals 'a decidedly negative attitude toward white people on the part of a person responsible for the employment decision." *Id.* quoting *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 n. 6 (11th Cir. 1990)). Critically, the employer's "white boy" comment was not made during an employment termination process; the Eighth Circuit merely noted that it was uttered "at some point during [plaintiff's] brief employment[.]" *Id.* at 633.

Sargent's comments similarly evince a "decidedly negative attitude toward" transgender people in general and Sickels in particular. While Sargent made his comments at unspecified times during Sickels's employment, that does not necessarily render them merely "stray" or unrelated to the decisionmaking process. They specifically concern Sargent's desire to exclude Sickels from his department. Unlike the plaintiff in *Browning*, however, Sickels had worked at the Electric Shop at the VA for several years prior to the challenged non-selection. The short duration of the *Browning* plaintiff's employment—sixty-seven days—ensured proximity between the challenged statement and the plaintiff's termination. Here, there is less evidence of a temporal connection between the comments and the challenged employment action, which extends the inferential leap required to attribute Sickels's non-selection to Sargent's "decidedly negative attitude" toward transgender people.

The Court need not decide whether Sickels has shown that her gender presentation motivated Sargent because it finds that she can proceed on a cat's paw theory. To do so, Sickels must show that one of Defendant's agents "is motivated by discriminatory animus and intentionally and proximately causes the action." *Bennet v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). Here, the evidence viewed in the light most favorable to Sickels shows that the interview panelists were motivated by discriminatory animus and intended to cause Sargent to not select Sickels for the position. This evidence includes:

- Pettis, Wehlermann, and Duffy's previous comments about Sickels's gender presentation, including referring to her by "it" and "thing" and "slamming her on her transgender status and what kind of woman she would be" in foreman meetings;

- Pettis's refusal to work or eat lunch around Sickels when she first came to the shop;

- Pettis's statement when he was promoted to supervisor he did not want her to "to even be close to being an electrician or even in the shops" (ECF No. 48-3 at 17:2-12);

- Wehlermann's previous comments expressing anger at Sickels's performance in the April 2018 interview for the same position;

- Pettis's statement that he lowered Sickels's interview score for the August 2018 position because he did "not want that thing in [his] shop" (*Id.* at 85:10-85:15);

- The fact that Wehlermann knew that Pettis changed Sickels's score because of his aversion to Sickels and just "sat there" (*Id.* at 86:13-17);

- The fact that the interview panel broke with regular practice at the VA by not recommending the five candidates with the highest interview scores; and

- The fact that the only panelist who did not evince discriminatory animus toward Sickels believed that she was more than qualified for the position, testifying: "She's – she's had multiple journeyman electricians that came from outside that's worked 20, 25 years in the industry saying that she's – she's a qualified electrician. I don't know how much more than – anybody needs. I really don't. I'm sorry for -- . . . – but I just – man." *Id.* 82:15-82:1.[6]

---

[6]    Defendant admits many of these facts, but it claims that the panelists' previous referring to Sickels as "it" and "thing" are sex neutral and do not evince discriminatory animus. This argument

At issue, then, is whether these panelists' scheme to prevent Sickels from being selected for the Electrician position was a proximate cause of Sargent's decision not to select her. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'links that are too remote, purely contingent, or indirect.' " *Staub*, 562 U.S. at 419 (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Moreover, an independent review by an unbiased decisionmaker does not necessarily cleanse an adverse action of discriminatory animus further upstream in the decisionmaking process. Even though "[t]he decisionmaker's exercise of judgment is also a proximate cause of the employment decision . . . it is common for injuries to have multiple proximate causes." *Id.* at 420 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)).

In the pre-*Staub* case *Qamyihah*, the Eighth Circuit analyzed "the precise level of control biased subordinates must exert over decisionmakers" to proximately cause an adverse employment action. *Qamhiyah*, 566 F.3d at 745. There, the plaintiff claimed that she was denied tenure at Iowa State University because of her national-origin, religion, sex, and pregnancy, citing various actions by faculty members, the fact that her pregnancies were referenced at a College Committee meeting, and other references to her sex and pregnancies. The Eighth Circuit assumed that this evidence demonstrated discrimination at lower-levels of her review, but it found that "there is simply no evidence that" the final decisionmaking "served as the conduit vehicle, or rubber stamp by which another achieved his or her unlawful design." *Id.* It explained:

> Qamhiyah's tenure-review case received a vigorous and thorough review. It included, in some form, approximately eighteen different assessments involving

---

strains credulity well past its breaking point. The evidence described above, which must be viewed in the light most favorable to Sickels, is more than sufficient to infer that these references were to Sickels's gender presentation; Defendant does not even attempt to provide an alternative explanation of these comments.

dozens of faculty members and administrators. According to undisputed portions of the record, evaluators at almost every level of review criticized Qamhiyah's scholarship, fundraising, and publishing records, and they overwhelmingly agreed that Qamhiyah did not satisfy ISU's standards for tenure. Though we recognize that there is evidence that upper-level reviewers did consider lower-level recommendations when evaluating Qamhiyah's case, the evidence nonetheless shows that the upper-level reviews were independent and that many of the reviews took place after Qamhiyah had voiced her concerns regarding prior votes. Moreover, there is simply no evidence indicating that these later reviews relied on filtered facts or material misrepresentations from others with alleged discriminatory motives. To the contrary, the record clearly shows that each level in the process received Qamhiyah's credentials for review and that, in the later stages of the process, Qamhiyah undisputedly received multiple opportunities to defend her record and respond to earlier criticisms."

*Id.*

There are salient differences between the facts of this case and those in *Qamhiyah*. The interview and decisionmaking process here was not as "vigorous and thorough" as in that case: the *Qamhiyah* plaintiff's tenure-review involved "approximately eighteen different assessments involving dozens of faculty members and administrators," *Id.*, while Sargent relied on Sickels's artificially lowered interview score, the interview panel's comments, Sickels's references, and her resume. Because there was less evidence before Sargent, the interview panel's score and comments constituted a greater portion of the overall evidence. Moreover, there is not overwhelming agreement that Sickels was not qualified for the position—at least one member of the interview panel believed that she was more than qualified. And Sickels did not have the opportunity to bring the discrimination in the interview panel to Sargent's attention before he made his final decision because there is no evidence she was aware of Pettis's lowering of her score or the panelists' other comments after her interview.

Based on this evidence, a reasonable jury could conclude that the interview panel's artificial lowering of Sickels's score and decision not to recommend her was a proximate cause of the adverse employment action. Though Sargent "independently reviewed" the candidates'

application materials, as the Supreme Court explained in *Staub*, "it is common for injuries to have multiple proximate causes." *Id.* at 420 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)). Moreover, this purportedly independent review was not particularly independent: it relied on Sickels's artificially lowered score, the panelists' comments, and the fact that the panel did not recommend Sickels for the position.

The Court notes that there is countervailing evidence as well: Sickels lacked formal education in electrical theory, her references did not state they observed her work in high voltage, and she was not journeyman proficient. But on a motion for summary judgment, the Court must view the evidence in the light most favorable to Sickels and draw all inferences in her favor. This evidence establishes a genuine dispute of whether the interview panel's discriminatory animus and actions were a proximate cause of Sargent's decision not to select Sickels. The Court will accordingly deny Defendant's motion for summary judgment on Count I with respect to the August 2018 Electrician position.

### 2. June 2020 WG-10 Electrician Position

Defendant next challenges Sickels's sex discrimination claim based on her non-selection for the June 2020 Electrician position. As explained above, Sickels and twelve other candidates were deemed minimally qualified by the SME panel for three Electrician vacancies, but Wehlermann and Duffy decided not to interview Sickels and five other candidates because Wehlermann "had one day to give for [an] interview panel," and those resumes did not reflect education in electrical theory, journeyman certification, or electrical field work and experience equivalent to that of a journeyman electrician. In support of Defendant's challenge, it claims that it had legitimate, non-discriminatory reasons for not interviewing her—her lack of journeyman

certification an education in electrical theory—and Sickels cannot demonstrate that these reasons are pretextual.

Sickels responds that Wehlermann and Duffy's previous comments are direct evidence of discrimination. She underscores that both individuals could recognize her resume by looking at it. And she claims that journeyman experience was not a job requirement, but Wehlermann and Duffy made it one so they could exclude Sickels from the interview process even though she was more qualified than the other candidates.

There is less direct evidence of discrimination for this position than for the August 2018 position. Unlike her non-selection for that position, there is no evidence of statements by her interviewers that they lowered their evaluation of her performance so she would not get the job. And Sickels's non-selection for an interview forecloses the possibility of evidence that the interview panel broke with its practice of selecting the highest scoring candidates. The Court also notes that Sickels claims that she was recommended for an interview by the SME panel, but the evidence she cites only states that she was determined to be minimally qualified for the position. The panel was not required to recommend all minimally qualified individuals for interviews; it could select the "best-qualified" applicants for interviews. The total evidence which could demonstrate an improper motive, then, is Wehlermann's and Duffy's previous statements about Sickels's sex.

The Court need not analyze whether these comments constitute direct evidence because Sickels's claim survives under the *McDonnell Douglas* framework. Defendant does not address whether Sickels has set forth a prima facie case of discrimination, but it claims that Wehlermann and Duffy declined to interview Sickels because of her lack of journeyman certification and education in electrical theory. Accordingly, the burden shifts to Sickels to show that these

reasons are pretextual.  She may do so by showing that Defendant's explanation is "unworthy of credence because it has no basis in fact" or "by persuading the court that a [prohibited] reason more likely motivated the employer."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)).

Sickels cannot show that Defendant's explanation has no basis in fact because she was not journeyman certified and she did not have formal education in electrical theory.  She also does not support her claim that the candidates who were selected for the interview were similarly or less qualified with any evidence from the record.  But Wehlermann and Duffy's previous comments are sufficient for a jury to conclude that Sickels's gender presentation more likely motivated their decision not to interview her.  Again, this evidence includes that Wehlermann repeatedly referred to Sickels as "it" and "thing", that he and Duffy made derogatory comments about Sickels's gender presentation at foreman meetings, that Wehlermann expressed anger at Sickels's performance in the April 2018 interview, that Wehlermann was aware that Sickels's score was reduced for the August 2018 interview and did not do anything, and that he had previously made comments about not wanting her in the shop.  Accordingly, there is a genuine dispute of whether Sickels's sex was a motivation for declining to interview her for the June 2020 Electrician position.  Defendant's motion for summary judgment with respect to this position will be denied.

### D.  Count II - Retaliation

Defendant next challenges Sickels's retaliation claim under 42 U.S.C. § 2000e-3(a).  That provision "makes it an unlawful employment practice for an employer to discriminate against its employees for opposing any unlawful employment practice."  *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016).  Like sex discrimination claims under Title VII, a plaintiff may provide direct evidence of retaliation or evidence supporting an inference of discrimination under the

*McDonnell Douglas* framework. To establish a prima facie case of retaliation, Sickels must show: "(1) she engaged in protected conduct, (2) she suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012). If Defendant proffers a legitimate, non-discriminatory reason for the adverse action, Sickels must show that this reason is pretextual.

In her opposition memorandum, Sickels "confines her retaliation claim to the June 2020 electrician position," so the Court will confine its analysis to that position as well. ECF No. 49 at 20. Defendant argues that Wehlermann's decision not to interview her for this position was based on the same legitimate, non-discriminatory reasons identified above: her lack of journeyman certification or education in electrical theory. Sickels responds that Wehlermann was aware of her prior EEO complaints, even complaining to Duffy that he was sick of her filing them. *Id.* at 21 (citing ECF No. 41-11 at 101:24-102:7). Citing Seventh Circuit precedent that a plaintiff need only show that the protected conduct was a "motivating factor" in the employer's decision, *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005), she claims that this is sufficient evidence for a jury to conclude that the adverse employment action was a motivating factor for the non-selection, and her lack of journeyman experience was merely a pretext.

There are two problems with Sickels's argument. First, the Supreme Court is clear that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); see also *Blomker*, 831 F.3d at 1059 ("It is not enough that retaliation was a substantial or motivating factor in the employer's decision" (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015))). Second, the evidence she cites does not provide a link between the challenged employment action and her protected activity. Sickels claims that

journeyman experience was not listed as a job requirement and that other candidates with similar or less electrical experience were interviewed.  But again, employers are entitled to prefer certain qualifications in addition to the minimum job requirements to be consider for a vacancy, and Sickels does not support her claim that the interviewees were similarly or less qualified.  Thus, the sum of the evidence potentially demonstrating retaliatory animus is Wehlermann's comment that he was "sick of [Sickels] filing EEO complaints."

This comment is insufficient to demonstrate that the decision not to interview Sickels was caused by her protected activity under the *McDonnell Douglas* standard.  The comment was made at an unspecified time, and there is no evidence that the comment was made in connection with the June 2020 interview.  Moreover, Sickels applied for the June 2020 position more than a year after she filed her amended charge of discrimination, stretching the temporal link between the protected activity and the alleged retaliatory action.

Because the summary judgment record does not permit an inference that the decision not to interview Sickels for this position was causally related to Sickels's protected activity, the Court will grant Defendant summary judgment on Count II.

## CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment on Sickels's remaining claims.  Sickels's hostile work environment claim and retaliation claim will be dismissed with prejudice, but Sickels's sex discrimination as to the August 2018 Electrician vacancies and June 2020 Electrician vacancies remain.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [ECF No. 39] is **GRANTED** in part and **DENIED** in part in accordance with this order.

**IT IS FURTHER ORDERED** that this matter is set for a telephone status conference on **Wednesday, August 21, 2024**, at **11:00 A.M**.  Counsel are directed to call the conference line toll free at **1-877-810-9415**.  The access code to enter the telephone conference is: **7519116**.

Dated this 16th day of August 2024.

_John A. Ross_

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE